Filed 7/22/16  In re S.A. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S.A., a Person Coming Under the Juvenile Court Law. | |
| AMBER S., Petitioner, v. THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent; CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, Real Party in Interest. | A148502 (Contra Costa County Super. Ct. No. J15-J00876) |

Petitioner Amber S. (Mother), mother of 11-month-old S.A., seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452, of the juvenile court's orders terminating reunification services and setting the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends substantial evidence does not support the juvenile court's finding that the Contra Costa County Children and Family Services Bureau (Bureau) provided reasonable services to her.  We shall deny the petition for extraordinary writ.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On August 17, 2015, the Bureau filed an original petition alleging that S.A. came within the provisions of section 300, subdivision (b). The petition alleged that Mother had a chronic substance abuse problem that significantly interfered with her ability to parent in that she had tested positive for cocaine and amphetamine in May 2015, during her pregnancy with S.A.; she had tested positive for amphetamine and ecstasy in August 2015, at the time of S.A.'s birth; S.A. had tested positive for amphetamine at the time of her birth; and Mother had a self-reported history of methamphetamine use since age nine.

On August 18, 2015, the juvenile court ordered S.A. detained.

In the detention/jurisdiction report filed on September 28, 2015, the social worker reported that she had interviewed Mother, who said that she was aware that S.A. was born exposed to methamphetamine and that she had "made a mistake." Mother also stated that she had been using methamphetamine "off and on" since she was nine years old. Mother had three other children between the ages of 8 and 16, none of whom were in her custody. Mother said she was willing to enter a drug treatment program.

At the September 28, 2015 jurisdiction hearing, Mother pleaded no contest and the court sustained the petition, which had been amended to state that Mother had a chronic substance abuse problem that interfered with her ability to parent in that she had tested positive for amphetamine and ecstasy at the time of S.A.'s birth and S.A. had tested positive for amphetamine at the time of her birth.

In the disposition report filed on November 4, 2015, the social worker reported that Mother had acknowledged a 20-year history of using methamphetamine, including the night before S.A.'s birth. She also acknowledged a significant criminal history related to her substance abuse. Mother reported having mental health issues for which she had required ongoing treatment. In 2003, she had been diagnosed with depression, borderline personality disorder with suicidal tendencies, and bipolar disorder, and had been hospitalized in the past. According to the social worker, Mother "has . . . ensured the state [that] her mental health continues to be monitored, and is in compliance with her psychotropic medications."

Mother had, however, "exhibited little in efforts to address substance abuse treatment," despite the fact that the social worker had provided her with treatment program information, including current availability, and ongoing orientation information on several occasions. The social worker had also encouraged Mother to enroll in outpatient treatment while she waited for a residential treatment opening. The social worker had repeatedly asked Mother about her progress with getting into treatment, but Mother said she could not make appointments for intake or orientations due to transportation issues and had declined the social worker's offer of bus passes. The social worker had referred Mother to drug testing, but Mother reported having difficulty obtaining an identification card due to problems obtaining her birth certificate from out of state. The social worker therefore arranged for her to obtain a temporary identification from the Bureau for purposes of drug testing only. The social worker had also referred Mother to parenting classes.

Mother was consistently participating in visitation with S.A., who had been placed in a foster home. S.A. was born premature and exposed to methamphetamine. There were concerns about jerky movements and potential seizure activity, although she appeared to be developmentally on target. Mother also has three older children, two of whom were living with relatives out of state and one of whom had been adopted by the maternal grandmother in an open adoption. The maternal grandmother had submitted paperwork to be assessed as a placement for S.A., although there were concerns about placing S.A. with her.

The Bureau recommended that reunification services be provided to Mother. The Bureau believed she would be best served by entering into a residential treatment program followed by outpatient treatment, as well as by random drug testing and ongoing participation in Narcotics Anonymous meetings. The Bureau also believed that, while recovery would be the primary focus of her case plan, Mother would also benefit from individual therapy and parenting classes.

At the November 4, 2015 disposition hearing,[2] the juvenile court adjudged S.A. a dependent child, and ordered out of home placement and family reunification services. The court adopted the Bureau's proposed case plan, which required Mother to participate in a mental health assessment and general counseling, a parenting education class, inpatient substance abuse treatment and aftercare, substance abuse testing, and a 12-step program.[3]

In the six-month review report filed on May 16, 2016, the social worker reported that she had referred Mother to the following services: random drug testing, 12-step meetings, a parenting class and a parenting partner, therapy, and supervised visitation. The social worker had also spoken with Mother several times about treatment programs, 12-step meetings, and drug testing, and had encouraged her to engage in services. Mother had initially reported that she was on waiting lists for multiple residential treatment programs. However, she never began drug testing or attending 12-step meetings. In February 2016, Mother told the social worker that one reason she was not going to 12-step meetings was because "she has a very difficult time being around people. In fact, she stated that she is seeing a therapist and taking Wellbutrin to help her with the problem." In March, Mother admitted that she had stopped trying to get into a residential treatment program and had never begun drug testing because " '[w]hat's the point when I would just give a dirty test?' "[4] When the social worker spoke with Mother about the possibility of adoption for S.A., Mother said, " 'I can't take care of myself so how can I take care of her?' "

---

[2] Mother tested positive for amphetamine at the disposition hearing.

[3] Mother's boyfriend was considered an alleged father until paternity testing indicated he was not the biological father. The court found that he was neither the biological nor the presumed father, and therefore ordered him removed as a party.

[4] Mother, who was helping her boyfriend to care for his disabled mother and the mother's roommate, said she was so overwhelmed from that activity "that she had no energy or desire to enter a drug program."

4

Mother had consistently participated in weekly supervised visits with S.A., during which she was "always loving and appropriate with the child." S.A. was in good health and was developmentally on target, both physically and cognitively. S.A. had been placed in a concurrent home in March 2016.

The Bureau recommended that the court terminate Mother's reunification services and set a section 366.26 hearing.

At the May 16, 2016 contested six-month review hearing, Social Worker Denise Spolerich testified that she had been the social worker assigned to the case since November 2015. Spolerich met with Mother in December 2015, and again in January 2016, at which time they discussed drug testing and what Mother felt was keeping her from attending 12-step meetings. Spolerich also referred her to several possible parenting classes.

In January 2016, Mother told Spolerich that she was seeing a psychiatrist, although Spolerich had "made the mistake of not following up on that" by getting the psychiatrist's name for verification purposes. Mother said she was seeing the psychiatrist through county mental health and that "she was really trying to work on the issues she was dealing with that she felt were keeping her from both going to 12-step meetings and participating in an inpatient program." Spolerich obtained a referral for Mother to participate in a mental health assessment through the Bureau's mental health liaison. At the end of January, Spolerich gave Mother the name of the mental health professional who would perform the assessment.

Spolerich and Mother also met in February 2016, and discussed Mother's case plan. Mother again reported that she was meeting with a psychiatrist every other week and was taking medication. Mother explained that she was seeing the psychiatrist due to her difficulty being around other people, which was one of the reasons she had not entered a drug treatment program or attended 12-step meetings. Spolerich encouraged her to continue with the therapy. Spolerich subsequently left a message for the psychiatrist, but was not able to make direct contact with him. During the February meeting, Mother also told Spolerich that she was still using methamphetamine.

5

Spolerich had most recently met with Mother on March 3, 2016, at which time they discussed the importance of residential treatment, drug testing, and the 12-step program requirement in Mother's case plan. Spolerich gave Mother a new drug treatment referral to three potential programs, along with the phone numbers to call. Between their in-person meetings, Spolerich and Mother also talked on the phone at least once a month.

Spolerich testified that Mother had been very regular in her visits with S.A. Spolerich did not know of any visits that she had missed.

At the conclusion of the hearing, the court found that Mother was a very sympathetic person who had experienced extensive trauma in her life, including in her relationship with her boyfriend. "And she has not been able to find a path out of that dysfunction and substance abuse. [¶] And [Mother] really is appropriate during the visits and very loving. It's seldom that I have ever read such warm comments and descriptions about what transpires in the visit. Which is very sad.

"On the other hand, I do find based on the testimony of Ms. Spolerich as well as what's contained in the report that reasonable services were offered. And that the social worker on multiple occasions provided referrals and information and encouragement to mother to get engaged and get started. It's not up to the [Bureau] to lead mother to the program. And at some point, if [Mother] is going to be successful, part of the test of that is being able to get up in the morning and finding yourself to [*sic*] those services. And [Mother] has just been unable to do that." The court therefore terminated reunification services and set the matter for a section 366.26 hearing on September 12, 2016.

On May 19, 2016, Mother filed a notice of intent to file writ petition.[5]

## DISCUSSION

### *Reasonable Services Were Provided*

Mother contends substantial evidence does not support the juvenile court's finding that reasonable services were provided.

---

[5] On June 17, 2016, we denied Mother's request for a stay pending resolution of the petition.

"The court shall not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(C); accord, § 361.5, subd. (a)(3).)

" '[T]he focus of reunification services is to remedy those problems which led to the removal of the children.' [Citation.] A reunification plan must be tailored to the particular individual and family, addressing the unique facts of that family. [Citation.] A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult. [Citation.] However, in most cases more services might have been provided and the services provided are often imperfect. [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599 (*Katie V.*); see also *In re Riva M.* (1991) 235 Cal.App.3d 403, 414 [a reasonable services finding is appropriate when the record shows "that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult"].)

We review the juvenile court's findings for substantial evidence, "reviewing the evidence in a light most favorable to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V.*, *supra*, 130 Cal.App.4th at p. 598.)

Here, Mother argues that the Bureau failed "to offer or provide any services pertaining to [her] mental health needs arising from her mental health disability." We disagree.

First, the circumstances underlying the dependency petition in this case involved Mother's chronic substance abuse and its effects on her ability to parent newborn S.A.

7

The Bureau therefore devised a case plan aimed at assisting Mother to overcome her substance abuse issues, with requirements that she participate in inpatient substance abuse treatment and aftercare, substance abuse testing, and a 12-step program. The social worker assigned to the case repeatedly attempted to assist Mother to meet these requirements. In face-to-face meetings and telephone calls, the social worker provided Mother with a number of referrals to and information regarding residential treatment programs, while also encouraging her to enroll in outpatient treatment until an opening in a residential program arose. The social worker also referred Mother to random drug testing and a 12-step program.

The social worker repeatedly encouraged Mother to engage in these services and discussed with her the barriers to doing so. When Mother said she was unable to get to intake appointments or orientations due to transportation issues, the social worker offered bus passes, which Mother refused. When Mother said she could not drug test because she did not have identification, the social worker arranged for her to obtain a temporary identification for drug testing purposes only. Despite the various referrals and support, Mother failed to engage in any of the offered services related to her substance abuse.[6]

Second, while participation in services related to overcoming her chronic substance abuse was the primary focus of Mother's case plan, the case plan also required her to participate in individual therapy, a mental health assessment, and parenting classes. Although Mother asserts that the Bureau never referred her to either a parenting education program or a mental health assessment, the record shows otherwise. Following the disposition hearing in November 2015, the social worker referred Mother to both a parenting class and a parenting partner. At the six-month review hearing, the social

_____

[6] Mother points out that the Bureau's drug testing referral process was changed during the course of the dependency and the social worker did not explain the new process to her until their meeting in March 2016. It is not clear from the record when the procedures for drug testing changed but, even assuming it was significantly before the March meeting, there is no evidence that Mother had ever attempted to drug test, much less that she had tried and been unsuccessful due to the change in procedures.

worker testified that, in January 2016, she gave Mother another referral to parenting classes and discussed the various options with her. The social worker also testified that, in late January, she obtained a referral for Mother to participate in a mental health assessment, for which she gave mother the contact information.

With respect to individual therapy, Mother reported that she had mental health issues that required treatment, having been diagnosed in 2003 with depression, borderline personality disorder with suicidal tendencies, and bipolar disorder. The social worker noted in the November 2015 disposition report that, although Mother had made little effort to address her substance abuse issues, she had "ensured the state of her mental health continues to be monitored" and was "in compliance with her psychotropic medications." During a February 2016 meeting with the social worker, Mother told her that one reason she was not going to 12-step meetings was because she had a hard time being around people, but said she was seeing a therapist and taking medication to help with the problem.[7] She was meeting with her psychiatrist every other week and "was really trying to work on the issues she was dealing with that she felt were keeping her from both going to 12-step meetings and participating in an inpatient program." The social worker encouraged Mother to continue with the therapy. Although, when Mother first told her that she was seeing a psychiatrist, the social worker had "made the mistake of not following up on that" by getting the psychiatrist's name from Mother, the social worker subsequently did leave a message for the psychiatrist, but was unable to make contact.

Mother claims that the Bureau's failure to better monitor and support her mental health needs undermined her ability to successfully engage in her case plan. The record belies Mother's assertion that the lack of sufficient mental health support rendered her unable to participate in the case plan. Although it would have been preferable for the

---

[7] Mother also said she had stopped trying to get into residential treatment because she was exhausted from other commitments and had no energy to enter a drug program. She had not begun drug testing because she did not see the point of doing so when she knew she would not test clean.

9

social worker to refer Mother for a mental health assessment before January 2016 and to have made additional attempts to contact Mother's psychiatrist, this alone does not demonstrate that the Bureau failed to provide Mother with reasonable services. Mother had ensured that her mental health needs were being addressed through regular therapy appointments and monitoring of her medication, which she believed was helping her. As she told the social worker, she was working with the psychiatrist to address her difficulty being around other people. On the other hand, after receiving the mental health assessment referral, she failed to participate in an assessment. In addition, it is notable that Mother was able to consistently attend weekly visits with S.A., during which she was always loving and appropriate. In fact, the social worker was not aware of her having missed a single visit.

Mother thus was able to participate in two components of her case plan: individual therapy and visitation, for which she is to be commended. It was the other case plan requirements, particularly those related to the substance abuse issues on which S.A.'s dependency was based, that she repeatedly failed to follow through with, while offering various excuses for not doing so.[8] The record thus reflects that the Bureau attempted to support Mother in overcoming the primary obstacle to reunification with S.A., i.e., her ongoing substance abuse. (See *Katie V.*, *supra*, 130 Cal.App.4th at pp. 598-599; *In re Riva M.*, *supra*, 235 Cal.App.3d at p. 414.) Unfortunately, Mother did not avail herself of the services offered.

Mother cites *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1792 and *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1320 in support of her argument that the Bureau was required to, but did not, accommodate her special needs as a mentally ill person. She again criticizes the Bureau's alleged failure to refer her for a mental health assessment or a parenting education course, which, as previously discussed, it in fact did. But she does not identify any special accommodations that should have been provided

_____

[8] She also failed to follow through with the referrals for a mental health assessment and parenting classes.

beyond the referrals to substance abuse and other services, along with the social worker's ongoing encouragement and reminders of the importance of satisfying her case plan requirements. (See *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762 ["The fact that a parent suffers from emotional problems does not excuse her from the statutory requirement of participating in a reunification plan, as some capacity to achieve the reunification goals is presumed"].) Mother unfortunately did not use the resources that were offered to support her in overcoming her substance abuse issues.

As in most cases, the services provided to Mother were not perfect, but they were plainly reasonable in the circumstances. (See *Katie V.*, *supra*, 130 Cal.App.4th at pp. 598-599.) Substantial evidence supports the juvenile court's finding that reasonable services were provided. (See *id.* at p. 598; see also §§ 361.5, subd. (a)(3), 366.21, subd. (g)(1)(C).)

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Miller, J.

11